837 So.2d 663 (2002)
IMPERIAL TRADING CO., INC.
v.
Michael J. UTER, Jack G. Menzie, et al.
No. 2001 CA 0506.
Court of Appeal of Louisiana, First Circuit.
December 20, 2002.
Writ Denied March 28, 2003.
*665 Michael T. Tusa, Jr., Kelly M. Rabalais, LeBlanc, Tusa & Butler, L.L.C., Metairie, for Plaintiff-Appellee Imperial Trading Co., Inc.
E. Wade Shows, Shows, Cali & Berthelot, L.L.P., Baton Rouge, for Defendant-Appellant Michael J. Uter.
Daniel D. Holliday, III, Long Law Firm, L.L.P., Baton Rouge, for Defendants-Appellants Jack and Connie Menzie.
Before: CARTER, C.J., PARRO, and CLAIBORNE,[1] JJ.
PARRO, J.
Certain members of two limited liability companies appeal from a judgment against them individually in a suit on an open account by a supplier of the limited liability companies, as a result of money removed from various checking accounts of the companies. For the following reasons, the judgment of the trial court is reversed in part and affirmed in part.

Facts and Procedural History
In 1992, Wayne Bunch (Bunch) and Thomas Harmon (Harmon) were operating several Tobacco Mart stores in Louisiana. Each of their stores was a separately organized legal entity, but seemingly all worked under the guise of Tobacco Mart, Inc. Many of the products sold by these Tobacco Mart stores were supplied by Imperial Trading Company, Inc. (Imperial). In dealing with Imperial, Bunch and Harmon were required to personally guarantee amounts owed on open account. Attorney Michael J. Uter (Uter) represented Bunch and Harmon in the organization of their Tobacco Mart entities.
Being intrigued by the opportunity for success, in 1992, Uter contacted Jack Menzie (Menzie), whom he had represented in several real estate transactions in the past, about the idea of opening additional Tobacco Mart locations in Louisiana and other states. Menzie and his wife, Connie S. Menzie (Ms. Menzie), agreed to inject money into the proposed venture. On October 21, 1992, $113,244.71 of Ms. Menzie's money was deposited into Uter's client trust account for investment in the tobacco business. This money was then deposited *666 into the checking accounts for various stores to assist with start-up expenses. Uter borrowed up to $25,000 of Ms. Menzie's money, either directly from his client trust account or from various store checking accounts that had been opened.
On advice of their accountant, Uter organized the ownership of these stores through limited liability companies, rather than individual corporations. Articles of organization and an initial report were prepared by Uter and filed with the secretary of state's office on October 27, 1992, for Tobacco Mart of Vidalia, L.L.C. (Vidalia L.L.C.) and on November 4, 1992, for Tobacco Mart of Mississippi, L.L.C. (Mississippi L.L.C.). Each of the articles of organization indicated that a written operating agreement was executed contemporaneously with it. In the initial reports for these organizations, Uter was listed as the registered agent for service of process and the initial manager. Tax returns disclosed ownership of Vidalia L.L.C. and Mississippi L.L.C. in Bunch (12.5 percent), Harmon (12.5 percent), Ms. Menzie (36.5 percent), Brennan Uter (36.5 percent),[2] Menzie (1 percent), and Uter (1 percent).
Subsequently, Uter and Menzie were introduced to Imperial's president by Bunch and Harmon. In light of Bunch and Harmon's recommendation that Imperial do business with Uter and Menzie and considering the potential for profit, Imperial established a line of credit in the amount of $50,000 for the purchase of products in favor of each of the following Tobacco Mart stores to assist with the start-up of these businesses: Vidalia, Vicksburg, Brookhaven, Greenville, McComb, 58 Crossing, Brainard, Signal, Shallowford, and Northgate. The indebtedness associated with these lines of credit was evidenced by separate promissory notes signed on either June 23, 1993, or September 1, 1993, by Uter and Menzie, in a dual capacity, individually and on behalf of the specified store. Security was given for the payment of these notes by a general security agreement also executed by Uter and Menzie in a dual capacity. On none of these documents, which had been prepared by Imperial, was it disclosed that these stores were doing business as limited liability companies.
On August 12, 1993, articles of organization and an initial report were filed with the secretary of state regarding Tobacco Mart of Tennessee, L.L.C. (Tennessee L.L.C.). According to tax returns, Tennessee L.L.C. was owned by Ms. Menzie (49 percent), Brennan Uter (49 percent), Menzie (1 percent), and Uter (1 percent). The articles of organization referenced the contemporaneous execution of a written operating agreement.[3] Relative to the store that was to be opened in Battlefield, Tennessee, a note dated January 13, 1994, evidenced indebtedness in the amount of $41,561.93 payable to Imperial.
In all, Imperial supplied 14 Tobacco Mart stores that were located in three different statesLouisiana, Mississippi, and Tennessee. These particular Tobacco Mart stores were opened in 1993 and 1994, were managed by Uter and Menzie, and were reportedly owned by Vidalia L.L.C., Mississippi L.L.C., and Tennessee L.L.C., depending on their location. From March 30, 1993, through May 3, 1994, checks were written on Tobacco Mart accounts to Uter totaling $28,057.
In the summer of 1994, Uter was contacted by an Imperial representative regarding *667 the payment on their open accounts and the possible termination of delivery of products. Around that same time, Menzie and Ms. Menzie decided they would withdraw from the businesses because of the financial status of the businesses. In June 1994, Ms. Menzie withdrew $263,852.48 from various Tobacco Mart checking accounts, which she asserted was a return of her investment and/or repayment of the loans she had made to the venture, with eight percent interest.
In light of financial concerns, the assets of the Tennessee stores were sold by Menzie to a third party in June 1994, and the sales proceeds were given to Imperial as payment on their accounts. After proper credit was given by Imperial, the Tennessee stores still owed $273,178.86 to Imperial on open account. In an effort to keep the Vidalia and Mississippi stores as a going concern, Uter began negotiations with Imperial, Bunch, Harmon, and Menzie. Based on Vidalia L.L.C. and Mississippi L.L.C.'s failure to timely pay on their open accounts, their stores were placed on a C.O.D. basis until Uter made other arrangements with Imperial for payments on their note payable accounts and open accounts. Once an agreement was reached concerning the continued operation of these stores, Imperial requested a personal guaranty from Uter, Bunch, and Harmon relative to Vidalia L.L.C. and Mississippi L.L.C.'s open accounts accruing after July 1, 1994.
On July 1, 1994, by verbal agreement, the Menzies withdrew from the Tobacco Mart operations in Louisiana and Mississippi. Operating agreements for Vidalia L.L.C. and Mississippi L.L.C., executed that same day, revealed the following ownership interests: Bunch25 percent, Harmon25 percent, Uter1 percent, and Brennan Uter49 percent. When this transition occurred, Vidalia L.L.C. and Mississippi L.L.C. owed Imperial a total of approximately $263,000 on open account. With the change in ownership, Bunch began to participate in the daily activity of the five remaining stores, which belonged to Vidalia L.L.C. and Mississippi L.L.C.
After failing in its attempt to work out a payment arrangement with Uter and the Menzies for amounts owed by the Tobacco Mart stores as of July 1, 1994, Imperial filed a suit against various defendants seeking recovery on promissory notes and amounts claimed due on open account. Subsequently, the promissory notes sued upon were satisfied, and a default judgment was entered against Tennessee L.L.C. for amounts owed by the Tobacco Mart stores in that state.[4] Ultimately, the case proceeded as one on an open account against Vidalia L.L.C., Mississippi L.L.C., Uter, Menzie, and Ms. Menzie.
Following the trial of this matter, the trial court found that Imperial had met its burden of proving that Vidalia L.L.C. and Mississippi L.L.C. were liable to it on an open account for $536,812.64. Relative to the June 1994 payments to Ms. Menzie, the trial court found that her withdrawals rendered the entities unable to pay their indebtedness to Imperial, resulting in a violation of LSA-R.S. 12:1327(A). Accordingly, it determined that the limited liability companies were entitled to a return of the money. As to the money paid to Uter, the trial court found that Uter's actions constituted an improper removal of business funds for personal use and benefit and required that the money be returned *668 to the limited liability companies. Therefore, judgment was rendered in favor of Imperial against Uter, individually, for $28,057; the Menzies, individually, for $263,852.48; and Vidalia L.L.C. and Mississippi L.L.C., in solido, for the entire amount of $536,812.64 owed by Vidalia L.L.C., Mississippi L.L.C., and Tennessee L.L.C. on open account, as well as $85,000 in attorney fees, and $3,700.54 in court costs. Uter and the Menzies filed separate appeals, seeking reversal of the awards against them individually.[5] Imperial filed an answer to their appeals, requesting the imposition of in solido liability against Uter and the Menzies for the entire amount owed on open account by the three limited liability companies, plus attorney fees and court costs.[6]

Standard of Review
The appellate court's review of fact is governed by the manifest errorclearly wrong standard. The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court, and 2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the trial court's finding, no additional inquiry is necessary for a finding of manifest error. However, if a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. See Stobart v. State, through Department of Transportation and Development, 617 So.2d 880, 882 (La. 1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 882-83; Morris v. Norco Construction Company, 632 So.2d 332, 335 (La.App. 1st Cir.1993), writ denied, 94-0591 (La.4/22/94), 637 So.2d 163.
Appellate review of questions of law is simply a review of whether the trial court was legally correct or legally incorrect. Medline Industries, Inc. v. All-Med Supply & Equipment, 94-1504 (La.App. 1st Cir.4/7/95), 653 So.2d 830, 832; O'Niell v. Louisiana Power & Light Company, 558 So.2d 1235, 1238 (La.App. 1st Cir.1990).

Personal Liability of Members for Company Debts
In its answer to the appeal, Imperial seeks to have Uter and the Menzies held liable in solido with Vidalia L.L.C. and Mississippi L.L.C. for the entire amount owed on the open account, attorney fees, and court costs, based on the theory of piercing of the veil of a limited liability company.[7] The following factors are stated *669 in support of piercing the veil: (1) fraudulent set-up, (2) confusion of ownership, (3) one "Tobacco Mart" letterhead for all limited liability companies, (4) common bank account, (5) fraudulent information on capital contributions, (6) advances by and between stores, (7) distributions of monies, and (8) alleged sale of the Tennessee stores.
By virtue of their articles of organization, Vidalia L.L.C. and Mississippi L.L.C. are limited liability companies, organized pursuant to the statutory scheme set up in LSA-R.S. 12:1301 et seq.[8] The Menzies and Uter maintain that the limited liability companies, through their various stores, ordered products from Imperial. A limited liability company offers, among other benefits, a company's members the benefit of limited liability. Hamilton v. AAI Ventures, L.L.C., 99-1849 (La.App. 1st Cir.9/22/00), 768 So.2d 298, 302. With respect to the liability of the members and managers of a limited liability company to third parties, LSA-R.S. 12:1320 provides:
A. The liability of members, managers, employees, or agents, as such, of a limited liability company organized and existing under this Chapter shall at all times be determined solely and exclusively by the provisions of this Chapter.
B. Except as otherwise specifically set forth in this Chapter, no member, manager, employee, or agent of a limited liability company is liable in such capacity for a debt, obligation, or liability of the limited liability company.
C. A member, manager, employee, or agent of a limited liability company is not a proper party to a proceeding by or against a limited liability company, except when the object is to enforce such a person's rights against or liability to the limited liability company.
D. Nothing in this Chapter shall be construed as being in derogation of any rights which any person may by law have against a member, manager, employee, or agent of a limited liability company because of any fraud practiced upon him, because of any breach of professional duty or other negligent or wrongful act by such person, or in derogation of any right which the limited liability company may have against any such person because of any fraud practiced upon it by him.
Thus, generally, under LSA-R.S. 12:1320(B), members of a limited liability company may not be assessed with personal liability for the debts and obligations of their limited liability companies to third parties absent proof of fraud. See LSA-R.S. 12:1320(D).
With respect to business corporations, there are limited exceptions to the rule of non-liability of shareholders for the debts of a corporation, whereby the court may ignore the corporate fiction and hold the individual shareholders liable. Riggins v. Dixie Shoring Company, Inc., 590 So.2d 1164, 1168 (La.1991). In such cases, Louisiana courts have allowed a piercing of the corporate veil under only two exceptional circumstances, namely, where the corporation is an alter ego of the shareholders and the shareholders have used the corporation to defraud a third party (the "alter ego" doctrine) and where the shareholders have failed to conduct a business on a "corporate footing," to such an extent that the corporation ceases to be *670 distinguishable from its shareholders. Riggins, 590 So.2d at 1168. Some factors to consider in determining whether to apply the alter ego doctrine include commingling of corporate and shareholder funds, failing to follow statutory formalities for incorporating and transacting corporate affairs, undercapitalization, failing to maintain separate bank accounts and bookkeeping records, and failing to hold regular shareholder and director meetings. Riggins, 590 So.2d at 1168. Louisiana courts are reluctant to hold a shareholder, officer, or director of a corporation personally liable for corporate obligations, in the absence of fraud, malfeasance, or criminal wrongdoing. Riggins, 590 So.2d at 1168. The determination of whether to allow a piercing of the corporate veil is made by considering the totality of the circumstances. Riggins, 590 So.2d at 1169.
In addition to having Vidalia L.L.C. and Mississippi L.L.C. solidarily liable for the entire balance owed on the open accounts of these two limited liability companies, as well as the amount owed by Tennessee L.L.C., Imperial seeks to have this court pierce the veils of these limited liability companies to hold the individual members of these companies liable for the awards made in favor of Imperial.[9] Based on the facts presented, Imperial sought to have the trial court find that the individual members, acting through the limited liability companies, committed fraud or deceit on Imperial and that the members failed to conduct the businesses on a business footing, disregarding the company entities to such an extent that the companies and their members became indistinguishable. However, the trial court declined to make such findings. The trial court's decision as to whether a company's veil should be pierced is a finding of fact and is thus subject to the manifest error-clearly wrong standard of Stobart. See Hamilton, 768 So.2d at 303. After a thorough review of the record, we conclude that reasonable support exists for finding that Imperial failed to prove that the limited liability companies were disregarded to the extent that they could not be distinguished from their members or that the actions of the members were fraudulent. Accordingly, the trial court's refusal to pierce the veils of these companies to impose liability on the individual members of Vidalia L.L.C., Mississippi L.L.C., and Tennessee L.L.C. is reasonably supported by the record.[10] Furthermore, we are unable to find manifest error in this decision.
Alternatively, Imperial asserts in solido liability is appropriate based on the concealment of the limited liability company ownership status of these businesses. Under Louisiana law at the time pertinent to this case, a principal was bound by the authorized or ratified acts of his agent. See LSA-C.C. art. 3021. The agent, however, was liable to those with whom he contracted on behalf of his principal only when he had bound himself personally or had exceeded his authority without informing the person with whom he contracted of the extent of his powers. See LSA-C.C. art. 3013. Generally, an agent is held to have bound himself personally when he entered into an agreement without disclosing the identity of his principal. *671 Frank's Door & Building Supply, Inc. v. Double H. Construction Company, Inc., 459 So.2d 1273, 1275 (La.App. 1st Cir.1984). The agent has the burden of proving that he disclosed his agency status and the identity of his principal if he wishes to avoid personal liability. However, express notice of the agent's status and the principal's identity is not required to escape personal liability if the agent proves that sufficient evidence of the agency relationship was known by the third party so as to put him on notice of the principal-agent relationship. Frank's Door & Building Supply, Inc., 459 So.2d at 1275.
Imperial alleges that Uter and Menzie concealed the fact that the Tobacco Mart stores with whom it had been doing business were owned by various limited liability companies. In determining whether such a concealment occurred in this case, we review the relationship between Uter, Menzie, and Imperial. Uter and Menzie testified that they were initially introduced by Bunch and Harmon to Imperial's president, who instructed them to deal with Imperial's credit manager. Uter and Menzie expressed an interest in opening more Tobacco Mart stores that were to be operated similarly to those being run by Bunch and Harmon. As previously stated, the Tobacco Mart stores belonging to Bunch and Harmon were each separately organized, with Bunch and Harmon assuming personal liability for amounts owed to Imperial on open account.
Imperial's chief financial officer (CFO) testified that when Imperial dealt with a corporate entity, it would obtain a personal guaranty with respect to open accounts. According to the CFO, Bunch and Harmon suggested to Imperial that Uter and Menzie be allowed to have similar terms as they had with Imperial to allow for expansion of the Tobacco Mart business into Mississippi and Tennessee. Initially, Imperial's CFO believed that Uter and Menzie's stores would operate under the same Tobacco Mart, Inc. umbrella that Bunch and Harmon's stores had. During the preparation of the necessary paperwork, Bunch and Harmon declined to sign a personal guaranty and informed Imperial that they had no financial responsibility for these new stores. In dealing with the Tobacco Mart stores that were opened by Uter and Menzie, Imperial identified each store by location, just as Uter and Menzie had in opening various business bank accounts. Promissory notes and general security agreements were prepared at the direction of Imperial's credit manager and executed by Uter and Menzie on behalf of each individual store, as well as individually. No personal guaranty was sought from Uter and Menzie relative to open accounts. Notably, Imperial's decision to extend credit to these new stores was not based on the creditworthiness of Uter and Menzie. The CFO explained that credit was extended based on the recommendation Imperial got from Bunch and Harmon and the probability of success.
Imperial's CFO testified that Uter and Menzie neglected to inform him that the business had been organized as a limited liability company, as opposed to a partnership or sole proprietorship.[11] Then he stated that he was advised by Uter and Menzie that these businesses were going to be set up as individual businesses and treated as a partnership; therefore, a personal guaranty was unnecessary. Yet, invoices *672 for the most part revealed that products were being sold to "Tobacco Mart, Inc." on Darryl Drive in Baton Rouge, Louisiana, the place designated as the registered office of the limited liability companies, and were being delivered to the individual stores.
According to the CFO, he was unaware that the Tobacco Mart stores opened by Uter and Menzie were operating under limited liability companies until June 1994, at which time Imperial ceased doing business with the Tobacco Mart entities until personal guarantees were executed in conjunction with open account sales. Nonetheless, we note that Imperial requested a financial statement of the existing businesses from Uter in conjunction with the proposed start-up of the Tennessee stores. A combined statement of assets and liabilities dated September 15, 1993, was sent to Imperial's credit manager, which disclosed Vidalia L.L.C., Mississippi L.L.C., and Tennessee L.L.C. as the businesses with whom Imperial was doing business.
Although there appears to have been some confusion as to the exact type of entity or entities with whom Imperial was dealing, the record reasonably supports a finding that Imperial representatives knew or reasonably should have known that Uter and Menzie were acting in a representative capacity, as opposed to an individual capacity. The trial court apparently found Uter and the Menzies had refuted Imperial's claim of undisclosed agency by providing sufficient evidence of Imperial's knowledge of the principal-agent relationship. That factual finding is reasonably supported by the record and is not manifestly erroneous.

The Menzies' Liability
The Menzies contend the trial court legally erred in finding that the withdrawal of funds by Ms. Menzie constituted an unlawful distribution in violation of LSA-R.S. 12:1327(A)(1). Distributions to members of a limited liability company are authorized by LSA-R.S. 12:1324 through 1326. Relative to interim distributions, LSA-R.S. 12:1324 provides:
A. Except as provided in this Chapter, a member is entitled to receive distributions from a limited liability company before the withdrawal of the member from the limited liability company and before the dissolution and winding up of the limited liability company to the extent and at the times or upon the occurrence of the events provided in an operating agreement or as authorized by the members.
B. Interim distribution of cash or other assets of a limited liability company shall be allocated among the members and among classes of members in the manner provided in a written operating agreement. To the extent such operating agreement does not so provide in writing, distributions shall be made equally to the members.
At the time of the withdrawal of funds by Ms. Menzie, LSA-R.S. 12:1325(B) provided as follows with respect to the distribution of company funds upon a member's withdrawal:[12]
Except as otherwise provided in this Chapter, on withdrawal or resignation, a withdrawing or resigning member is entitled to receive such distribution, if any, to which the member is entitled under a written operating agreement and, if not *673 otherwise provided in a written operating agreement, within a reasonable time after withdrawal or resignation, the fair market value as of the date contributed of the member's capital contribution.
Restrictions are placed on the making of any distributions by LSA-R.S. 12:1327(A), which provides:
No distribution shall be made if, after giving effect to the distribution:
(1) The limited liability company would not be able to pay its debts as they become due in the usual course of business.
(2) The limited liability company's total assets would be less than the sum of its total liabilities plus, unless the articles of organization or a written operating agreement provides otherwise, the amount that would be needed if the limited liability company were to be dissolved at the time of the distribution to satisfy the preferential rights of other members upon dissolution which are superior to the rights of the member receiving the distribution.
(3) The authorization or payment thereof would be contrary to any restrictions contained in the articles of organization or a written operating agreement.
In contemplation of her withdrawal, Ms. Menzie wrote checks dated June 3, 1994, payable to herself from the accounts of various Tobacco Mart entities, totaling $263,852.48.[13] After examining the evidence, the trial court found that the tax returns of Vidalia L.L.C. and Tennessee L.L.C. did not reflect capital contributions by Ms. Menzie of $240,000. Furthermore, it noted that there were no security agreements in favor of Ms. Menzie related to any alleged loans by her to the Tobacco Mart entities. Without classifying the nature of these payments as a return of capital or loan repayments, the trial court simply assumed that such payments were distributions as contemplated by the restrictions set forth in LSA-R.S. 12:1327.
At trial, Ms. Menzie testified that the payments were made to repay amounts that had been loaned by her to the Tobacco Mart entities. On appeal, the Menzies abandon that theory and concede that these payments constituted the return of the fair market value of Ms. Menzie's capital contributions. Accordingly, we must ascertain if the trial court erred in determining that these distributions were wrongfully made.
Distributions prior to withdrawal of a member or dissolution of a limited liability company are specifically addressed by LSA-R.S. 12:1324. The payments to Ms. Menzie were not of the type contemplated by this statutory provision. Admittedly, they were more in the nature of the distributions authorized by LSA-R.S. 12:1325, as they were made in conjunction with her membership withdrawal. Notably, LSA-R.S. 12:1325 speaks in terms of contributed capital and authorizes the removal of such funds within a reasonable time after withdrawal. Thus, the distributions made prior to her withdrawal were not made in accordance with LSA-R.S. 12:1325.[14] The Menzies urge error in the trial court's finding that the distributions to Ms. Menzie resulted in an inability to pay the debts of the limited liability companies as they came due.
*674 As per the September 15, 1993 consolidated statement provided to Imperial, the assets of the three limited liability companies exceeded their liabilities by $327,829.96. Yet, the 1993 consolidated tax return for those limited liability companies discloses a net loss for the year of $16,568 and liabilities exceeding assets by $25,905 at year's end. Included in their 1993 year-end liability calculation were notes payable to Ms. Menzie in the amount of $134,973. The 1994 consolidated tax return for Vidalia L.L.C. and Mississippi L.L.C. discloses a net loss for the year of $29,088, with the separate return for the Tennessee L.L.C. showing a net loss of $245,620. By the end of 1994, the disparity in the liabilities and assets of Vidalia L.L.C. and Mississippi L.L.C. had increased to $88,415, with the liabilities still exceeding the assets. The liability calculation for 1994 did not include an amount for notes payable to Ms. Menzie, as such payables were apparently considered as having been satisfied by the June 3, 1994 distributions to her. Relative to Tennessee L.L.C., its 1994 return reflected that its liabilities exceeded its assets by $183,102. Furthermore, a demand letter from Imperial dated June 14, 1994, revealed that the Tobacco Mart entities owed it a balance of $562,344.25 for products supplied between May 4, 1994, and May 26, 1994.
In addition to this evidence, Ms. Menzie initially testified that she was unaware of the balance in the various accounts at the time the checks were written, nor was she able to recall the amount of the account payables. Subsequently, she stated that she assumed that she had examined the balance of each checking account on which the checks were drawn, but she was not certain. The stub for the check issued to Ms. Menzie for $107,000 from the general Tobacco Mart operating account disclosed a remaining balance in that account of $12,373.26. The balances of the other Tobacco Mart checking accounts were not revealed at trial. However, Uter testified that without the funds withdrawn by Ms. Menzie on June 3, 1994, there was very little left in the various Tobacco Mart accounts with which to make payment on their payables, and thus Vidalia L.L.C., Mississippi L.L.C., and Tennessee L.L.C. could not meet their obligations to Imperial.
Based on the evidence presented, the trial court found that the June 3, 1994 distributions to Ms. Menzie rendered the entities unable to pay their indebtedness to Imperial, resulting in a violation of LSA-R.S. 12:1327(A)(1). As the moving party, Imperial bore the burden of proving that a violation of LSA-R.S. 12:1327(A)(1) had occurred. To satisfy such burden, Imperial was required to prove that, because of the June 3, 1994 distributions to Ms. Menzie, Vidalia L.L.C., Mississippi L.L.C., and Tennessee L.L.C. were unable to pay their debts as they became due in the usual course of business. The Menzies submit that this burden could not be met, in light of the fact that Vidalia L.L.C. and Mississippi L.L.C. continued as a going concern doing between $8 million to $9 million in business with Imperial between June 1994 and 1996. We disagree. The record reveals that the continued viability of these companies was dependent on the restructuring of company debt and the granting of personal guarantees relative to open accounts with Imperial by the members of these companies. Uter testified that this new business arrangement contemplated the withdrawal of the Menzies, who were unwilling to make such guarantees, from the businesses and the assumption of a larger role in the operation of the stores by Bunch and Harmon. The debt restructuring involved only the amounts owed on the promissory notes. Payments *675 made on open account by Vidalia L.L.C. and Mississippi L.L.C. after that time were applied by Imperial to the purchases made after the Menzies' withdrawal on July 1, 1994, as envisioned by their new business arrangement. Amounts owed prior to July 1, 1994, remained unpaid and are the subject of this lawsuit.
After a thorough review of the record, we are unable to conclude that the trial court erred in finding that Imperial proved that Vidalia L.L.C., Mississippi L.L.C., and Tennessee L.L.C. were not able pay their debts as they became due in the usual course of business as a result of the June 3, 1994 distributions made to Ms. Menzie. Reasonable support for such a finding can be found in the record, and the finding is not clearly wrong.[15]
In light of the fact that they are separate in property, the Menzies question the imposition of liability on Menzie for these dispositions. However, LSA-R.S. 12:1328[16] imposes joint and several liability on the members or managers of a limited liability company who knowingly, or without the exercise of reasonable care and inquiry, vote for or assent to a distribution in violation of LSA-R.S. 12:1327. Such liability falls on each member, if management is reserved to the members, or each manager, if management is vested in one or more managers pursuant to LSA-R.S. 12:1312. Louisiana Revised Statute 12:1312 pertains to management by managers in accordance with the articles of organization or an operating agreement. The management of Vidalia L.L.C., Mississippi L.L.C., and Tennessee L.L.C. was seemingly vested in two managers in this case, Menzie and Uter, by virtue of an oral operating agreement. Thus, liability fell in this case on those managers who knowingly, or without the exercise of reasonable care and inquiry, voted for or assented to the distributions made to Ms. Menzie in violation of LSA-R.S. 12:1327. Accordingly, each manager would be liable jointly and severally to the limited liability company for the amount that the member received in violation of LSA-R.S. 12:1327.
Although the record does not reveal a knowing violation of LSA-R.S. 12:1327, it reasonably supports a finding that such distributions were made without the exercise of reasonable care and inquiry as to whether they were wrongful, as defined by LSA-R.S. 12:1327. Under the facts of this case, it is obvious that Menzie assented to the distributions made to his wife. For that reason, we are unable to conclude that the trial court erred in finding that Menzie, *676 as an assenting manager, even though separate in property from Ms. Menzie, was also personally liable for the return of those distributions.

Uter's Liability
In addition to having Menzie held liable with Ms. Menzie for the amount wrongfully distributed, Imperial seeks to have Uter held personally liable for such amount. Under LSA-R.S. 12:1328(A), Uter may be held personally liable to the limited liability company for such distributions only if he was found to have assented to the distributions made to Ms. Menzie, without the exercise of reasonable care and inquiry, in violation of LSA-R.S. 12:1327. Uter explained that he learned that the Tobacco Mart entities were behind in their open account payments to Imperial prior to receiving Imperial's June 14, 1994 demand letter. After inquiring with the secretary for the Tobacco Mart entities, she suggested that he examine the checkbooks. According to Uter, it was not until that time that he learned of the withdrawals by Ms. Menzie. He denied learning, prior to June 3, 1994, that Ms. Menzie intended to withdraw the money she had allegedly contributed to these entities. He testified that he subsequently requested that the money be returned to the entities.
According to Menzie, Uter advised Ms. Menzie to get her money out before their interests were transferred to Bunch and Harmon. This testimony was corroborated by that of Ms. Menzie. Ms. Menzie, however, admitted that she did not know if Uter was aware of the exact amounts[17] or the particular day that she intended to take the money.
Although the trial court made no express finding regarding which line of testimony it found to be more credible, it did find that business was conducted in such a manner that the members of the several business entities were unaware of some of the things the other members were doing in the daily operation of these business entities. Additionally, it refused to impose personal liability on Uter for the distributions made to Ms. Menzie. Uter's testimony, if believed by the trial court, certainly provides reasonable support for such a finding. Furthermore, we are unable to find that the trial court clearly erred in failing to hold Uter jointly and severally liable for the June 1994 distributions to Ms. Menzie.
Uter contends the trial court erred in finding that $28,057 was improperly paid to him between March 30, 1993, and May 3, 1994. In resolving the issue of Uter's liability to the limited liability companies, the trial court simply found that he improperly removed or took $28,057 from various Tobacco Mart accounts for his personal use and benefit, which amounts he should be required to pay back. No separate finding was made by the trial court as to whether the removal of such funds constituted a distribution or whether such a distribution constituted a violation of LSA-R.S. 12:1327(A)(1).
Uter submits that the amount of the award was equal to the sum of the checks payable to Uter prior to the June 14, 1994 notice of default. Concerning the 10 checks in question, Uter testified that certain checks were made payable to him for the purpose of obtaining cash to pay vendors for neon signs ($12,500),[18] an attorney for legal representation in conjunction with a trademark search ($2,100), an individual who held the trademark for the name *677 "Tobacco Mart" in Tennessee for a licensing fee ($5,000), and himself as reimbursement for travel expenses ($821). The notations on these checks totaling $20,421 support Uter's testimony. Although he did not account for use of the proceeds from the other five checks totaling $7,636,[19] Uter explained that the cash was used to pay for goods and services provided during the opening of out-of-state Tobacco Mart stores. According to Uter, cash was needed because many vendors with whom he dealt in opening the new stores refused to accept checks drawn on a new bank account.
In countering this argument, Imperial simply notes that the 10 checks were issued to Uter or his trust account. It further contends that, of the money received from these checks, Uter conceded that he took $25,000 as a personal loan for which no promissory note was issued. According to Imperial, no portion of the borrowed amount was repaid. Imperial's assertions to this effect are not supported by the record. Outside of Uter's testimony pertaining to the 10 checks referenced above, he admitted that he had borrowed, with Menzie's permission,[20] up to $25,000 of the $113,244.71 contributed by Ms. Menzie that was at one time deposited in his client trust account for investment in the tobacco business. Uter explained that the money from these loans was used by him to make ends meet during a three or four-month period that he was away from his law practice while working to open the Tobacco Mart stores without drawing a salary. The $28,057 of proceeds from the checks issued to Uter from March 30, 1993, to May 3, 1994, is separate and apart from the money that he borrowed in the early stages of this venture.[21] Accordingly, the record does not support the trial court's apparent finding that $28,057, as evidenced by the 10 checks previously referred, was improperly removed or taken from the Tobacco Mart stores for his personal use and benefit so as to possibly expose Uter to personal liability under LSA-R.S. 12:1328. Furthermore, such a finding was clearly wrong, thus warranting the reversal of the award against Uter.[22]

Decree
For the foregoing reasons, the judgment in favor of Imperial against Uter is reversed. In all other respect, the judgment is affirmed. Costs of this appeal are assessed one-half to Jack and Connie Menzie and one-half to Imperial Trading Company, Inc.
REVERSED IN PART AND AFFIRMED IN PART.
CARTER, C.J., concurs.
NOTES
[1] Judge Ian W. Claiborne, retired from the Eighteenth Judicial District Court, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Brennan Uter was Uter's college-aged son.
[3] Any contemporaneous written operating agreements are not in the record. The only such agreements in the record were executed July 1, 1994, by Bunch, Harmon, and Uter.
[4] Bunch, Harmon, and Brennan Uter were dismissed from the suit pursuant to a settlement agreement. Moreover, all interested parties assigned to Imperial their rights, claims, and causes of action against Uter, Menzie, and Ms. Menzie.
[5] Vidalia L.L.C. and Mississippi L.L.C. did not appeal.
[6] In its answer to the appeal, Imperial also requested an award of additional attorney fees and costs associated with responding to the appeals. Since this contention was not briefed, it is considered to have been abandoned. See Uniform RulesLouisiana Courts of Appeal, Rule 2-12.4.
[7] When considering the liability of a corporation, "veil-piercing" is a term used to refer to a court's refusal to recognize the separate existence of a corporation and to impose personal liability on shareholders for the corporation's debts. The same policy considerations in piercing the veil of a corporation apply to a limited liability company. Susan Kalinka, Louisiana Limited Liability Companies and Partnerships, § 1.32, pp. 80-81 in 9 Louisiana Civil Law Treatise (3rd ed.2001).
[8] All references to law in this opinion are to the law that was in effect when the events of this case took place.
[9] In Hamilton v. AAI Ventures, L.L.C., this court seemingly applied the single business theory, although treated as an application of the alter ego doctrine, to ignore the separate status of a limited liability company to reach the assets of its majority member. See Kalinka, Louisiana Limited Liability Companies and Partnerships, § 1.32 at 89.
[10] In so ruling, we render no opinion as to whether veil-piercing is available in the case of limited liability companies as it is in the case of corporations.
[11] The record establishes that prior to dealing with Imperial's CFO, Uter and Menzie provided financial information to Imperial's credit manager, who prepared the necessary documents for the commencement of business. By the time that Uter and Menzie met with the CFO, Imperial had already begun doing business with the new Tobacco Mart entities.
[12] LSA-R.S. 12:1325 was subsequently amended by 1995 La. Acts, No. 847, § 3, effective June 27, 1995. In Sage v. Radiology and Diagnostic Services, L.L.C., 01-2445 (La. App. 1st Cir.11/08/02), 831 So.2d 1053, this court held that the amendment had prospective effect only.
[13] This sum included $240,000, which supposedly represented a capital contribution and/or loans, and the remainder represented the interest earned at a rate of eight percent interest.
[14] We find the default provision of LSA-R.S. 12:1325(B) to be applicable in the instant case in the absence of evidence that the written operating agreements provided otherwise.
[15] The right to pursue such recovery was assigned to Imperial by virtue of a settlement agreement executed by the members of the limited liability companies involved in this case. Although questioned early on in these proceedings, the right of Imperial to assert this claim has not been raised on appeal.
[16] Liability for wrongful distributions is governed by LSA-R.S. 12:1328, which in pertinent part provides:

A. Each member, if management is reserved to the members, or manager, if management is vested in one or more managers pursuant to R.S. 12:1312, who knowingly, or without the exercise of reasonable care and inquiry, votes for or assents to a distribution in violation of the articles of organization, an operating agreement, or R.S. 12:1327 shall be jointly and severally liable to the limited liability company for the amount of the distribution that exceeds the amount that could have been distributed without violating R.S. 12:1327, the articles of organization, or an operating agreement. Each member shall be liable to the limited liability company for the amount which the member received in violation of this Section.
B. Each member or manager liable under Subsection A of this Section for an unlawful distribution shall be entitled to a contribution from each other member or manager who could be held liable under such Subsection.
[17] Uter testified that he was aware that Ms. Menzie had initially put $113,244.71 into the business venture. He also knew that she had contributed other amounts but was uncertain as to the exact amounts.
[18] $12,500 = $9,500 on March 30, 1993 + $3,000 on April 28, 1993.
[19] $7,636 = $2,000 on April 15, 1993 + $2,000 on September 8, 1993 + $3,000 on September 14, 1993 + $25 on April 20, 1994 + $611 on May 3, 1994.
[20] Ms. Menzie stated that Uter never inquired of her concerning his borrowings.
[21] The matter of the $25,000 is not before the court at this time. Uter recounted that $13,500 of the borrowed funds came directly from his client trust account funds, with the remainder coming from various entity accounts. As to those funds borrowed from Uter's client trust account, there was no withdrawal in violation of LSA-R.S. 12:1328(A). If any of the remaining debt was owed to the L.L.C.s, it was not part of an open account.
[22] In making this determination, we render no opinion as to Uter's liability concerning amounts that were borrowed from his client trust account funds and various entity accounts during the three-month periodOctober through December 1992that Uter and Menzie initiated efforts towards opening the Vidalia store and four stores in Mississippi.